**AMERICAN CENTRAL INS. CO. v. TERRY.**
(No. 3434.)

Court of Civil Appeals of Texas. Texarkana.
Oct. 13, 1927.

**1. Appeal and error ☞1002—Jury's finding on conflicting evidence will not be disturbed on appeal.**

Finding of jury on conflicting evidence will not be disturbed by appellate court.

**2. Insurance ☞612(3)—Under policy requiring arbitration on disagreement as to amount of loss and prohibiting suit until arbitration is had, disagreement and arbitration are prerequisites to maintenance of suit.**

Where insurance policy provides for arbitration of amount of loss on disagreement of parties and prohibits suit until arbitration is had, such disagreement is prerequisite to right to demand arbitration, and arbitration becomes prerequisite to maintenance of suit on policy.

**3. Insurance ☞665(7)—Evidence held to show disagreement between insured and adjuster requiring arbitration.**

Evidence *held* sufficient to show actual disagreement between insured and insurer's adjuster, making operative provision in policy for arbitration of differences.

**4. Insurance ☞665(7)—Evidence held not to show that failure to select umpire was fault of insurer's appraiser, entitling insured to ignore arbitration provision.**

Evidence *held* not to show that failure of appraiser to select umpire was due solely to neglect or fault of insurer's appraiser, entitling insured to sue on policy without further demand for new arbitration or resumption of pending arbitration, as provided in policy.

**5. Insurance ☞665(7)—That appraiser of insurer had acted similarly many times before held not alone sufficient to show his partiality in particular case.**

Fact that appraiser selected by insurer had been so selected many times before does not necessarily show appraiser's partiality in particular case, in absence of act or conduct tending to exhibit his serving insurer's interest.

Appeal from District Court, Red River County; R. J. Williams, Judge.

Action by C. R. Terry against the American Central Insurance Company, wherein the Paris Building & Loan Association intervened. From a judgment for plaintiff and intervener, defendant appeals. Reversed and remanded.

This suit was brought by appellee against appellant on a fire insurance policy insuring him against loss or damage by fire to a certain residence in an amount not to exceed $4,500. The petition claimed that the building became a total loss by fire on December 13, 1925, and that the full amount insured is payable as in the nature of a liquidated de-

mand. The Paris Building & Loan Association, holder of a lien against the insured property, intervened, claiming payment, under the loss payable clause of the policy, of the loss as its interest may appear. Appellant first filed a plea in abatement, and then, subject to the plea in abatement, filed an answer pleading a general denial, that the injury to the building was a partial loss to the extent only of $600, and forfeiture because of false swearing in the preparation of the proof of loss, and because of failure to comply with the provisions of the policy as to appraisal. Appellee filed a reply to the plea in abatement and to the answer. The plea in abatement was heard along with the merits of the case. In accordance with a jury verdict the court entered judgment denying the plea in abatement and awarding a recovery of $3,600 to the plaintiff, less $2,717.05 decreed to be paid to intervener. The insurance company has appealed.

[1] It was proved that on December 13, 1925, a fire of unknown origin caused a loss or damage to the insured building. The policy was in full force at the time of the fire. It is admitted that the intervener had a valid lien and to the amount alleged. Whether or not the residence was a total loss, as well as the amount of damages suffered, were disputed issues in the case. The evidence was conflicting on both issues. The jury made the findings of fact that the fire did not occasion "a total loss" of the building, and that the damage to the building was $3,600. This court would not be warranted in settling the conflict of evidence, and accordingly such findings of the jury will stand approved. On January 13, 1926, the insured presented a proof of loss to the agent of the insurance company, which was sworn to before a notary public, in which he declared that the property "was destroyed or damaged to the extent of $4,700," and which amount was the "sound value" of the building before the fire, and claimed the full $4,500 of the policy on account of total loss of the residence by fire. The insurance company claimed that the statement was untrue, and in avoidance of the policy under the provision reading:

"This entire policy shall be void * * * in case of any fraud or false swearing by the insured touching any matters relating to this insurance on the subject thereof, whether before or after a loss."

Appellee testified that the residence actually cost him $4,700 when built 15 months before occurrence of the fire, and that he was claiming that the residence was a total loss by fire. Some evidence went to corroborate appellee. There was also evidence going to show that the fire did not cause a total loss of the residence, and only damaged it. The jury found that the insured was "not guilty of false swearing," meaning un-

der the charge that he did not "willfully and corruptly swear falsely with the intent to cheat and defraud the defendant, and with the view to obtain damages from the defendant which he knew he had not suffered." We are not authorized to set aside this finding of the jury.

The defendant sought to abate the action, and for grounds therefor alleged:

(1) That the policy sued on, among other things, provided "that, in the event of a disagreement as to the amount of loss, the same should be ascertained by two competent and disinterested appraisers, the insured and this company each selecting one, and the two so chosen shall first select a competent and disinterested umpire; the appraisers should then estimate and appraise the loss," etc.

(2) That a disagreement had arisen between the insured and the company as to the amount of loss.

(3) That a demand for appraisal had been made by the company.

(4) That appraisal agreement had been entered into and that the insured had appointed J. F. Kunkel, of Clarksville, Tex., as an appraiser, and that company had appointed A. L. Hartshorn of Fort Worth, Tex., as an appraiser.

(5) That said appraisers failed to agree upon an umpire through failure and refusal and fault of J. F. Kunkel, and that then the defendant requested and demanded of plaintiff that the appraisal continue and be renewed, which he refused and at once brought this action.

(6) That the terms of the policy further provided "that no action or suit on this policy for the recovery of any claim shall be sustainable in any court of law or equity until after full compliance with all of the foregoing requirements."

The plaintiff met such plea in abatement and alleged:

(1) That the loss was a "total one," and the provisions of the policy providing for an appraisal had no application.

(2) He denied that any disagreement as to the amount of loss as contemplated by the terms of the policy had ever arisen between him and the company.

(3) The right to demand arbitration under the terms of the policy having never arisen, there being no disagreement as to loss, that he did enter into the arbitration which resulted in the arbitrators' failing to agree upon an umpire would not defeat his right to sue on the policy; that such agreement to arbitrate was a collateral agreement not based on the policy sued on, and the same did not provide that an award should be a prerequisite to bringing suit on the policy.

(4) That the company had knowingly violated the terms of the arbitration provisions of the policy by appointing A. L. Hartshorn as an appraiser to act thereunder, for the reason that the said Hartshorn was not a "disinterested" person and was disqualified to so act in that he was a professional arbitrator regularly retained by this company and various other insurance companies as an appraiser.

(5) That the failure to carry out the arbitration agreement was due solely to the acts of the said Hartshorn in refusing to accept one of the several parties named by Kunkel to serve as umpire, all of whom were qualified to act, and further in his arbitrary demand that such umpire be a contractor that did not live in Red River county, and one that he, Hartshorn, knew; that such demands were inconsistent with the terms of the policy and the arbitration agreement, and were so arbitrary that they amounted to a fraud and relieved the insured from further proceeding with the arbitration.

The court sought to determine the issues raised by these pleadings, and, of course, a basis for his action on the plea in abatement, by submitting to the jury the following questions:

Question No. 1. "Was the building in issue in this case, after the fire, a total loss?" To which the jury answered, "No."

Question No. 2. "Did the defendant's adjuster, J. C. Roberts, acting with the plaintiff, attempt to ascertain and estimate plaintiff's loss and damage?" To which the jury answered, "No."

Question No. 3. "Was A. L. Hartshorn, upon the occasion in question, a fair and impartial appraiser?" To which the jury answered, "No."

Question No. 4. "Was J. F. Kunkel, upon the occasion in question, a fair and impartial appraiser?" To which the jury answered, "Yes."

Question No. 5. "Was the failure of J. F. Kunkel and A. L. Hartshorn to agree upon an umpire due to the neglect or fault of either of them?" To which the jury answered, "Yes."

Question No. 6. "To the neglect or fault of which of them was their failure to agree upon an umpire due?" To which the jury answered, "Hartshorn."

The evidence bearing upon the plea is referred to in the opinion.

Edgar Wright, of Paris, and E. G. Senter, of Dallas, for appellant.

Robbins & Bailey, of Clarksville, for appellee.

LEVY, J. (after stating the facts as above). [2, 3] The principal and controlling question duly presented by appellant for review is that of whether or not the plea in bar of the action should have been sustained. It is conceded as a settled rule of law, set out in numerous cases, that where a policy of insurance provides, as in the present case, for the arbitration as to the amount of loss in the event of disagreement between the parties, and that no suit shall be brought upon such policy until such arbitration is had, such

disagreement is prerequisite to the right to demand such arbitration, and arbitration becomes a prerequisite to the maintenance of a suit on the policy. Scottish Union & National Insurance Co. v. Clancy, 71 Tex. 5, 8 S. W. 630. There was a timely mutual agreement in writing to arbitrate the loss under the terms of the policy. And it must be taken as a fact, as found by the jury under ample evidence, that the actual loss by the insured was not a total, but a partial, loss, and less than the insurance. In view of the pleadings, the first question, therefore, before the agreement was signed, was there a disagreement in fact between the parties of the amount of loss by the insured? As appears, the fire occurred on December 13, 1925. The insurance company on December 23 sent its adjuster to ascertain the loss and "to adjust the loss" with the insured. The adjuster testified, and it was not disputed, that, upon arrival at the place of the fire:

He "made a thorough examination of every room, the attic, and roof of the house upon which Mr. Terry was claiming a loss; made a detailed examination of the entire premises to determine the amount of damage done. I estimated the amount of damage by making a liberal allowance for every item of damages, as not exceeding $950."

Thereupon the adjuster and the assured had a meeting together concerning the amount of the loss. At that meeting the insured submitted to the adjuster an itemized estimate of loss that he had a contractor to make out for him. The amount of the estimate was $2,334.27. According to the insured's evidence, the adjuster "refused to accept my estimate as the basis for settlement, saying, 'It is too high; it is padded.'" Thereupon the insured, as he says,

—"made another proposition to Mr. Roberts (adjuster). I told him that if he would pay me in 10 days, so that I could go back in the house, and eliminate costs, I would take $2,250. He said that he would not accept that. I did not make him any other offer, and he did not make me any other offer. He said, 'We can't agree, and I have got to go.' I followed him to his car and asked him what I should do if he would not settle with me. He said it didn't make any difference with him; that he didn't have time to fool with me."

It then appears that the adjuster made another trip, about January 10, 1926, to adjust the loss with the insured. In the meantime the insured had employed an attorney to represent him. As testified by the insured:

"He [adjuster] came back and saw me again. I just had a short conversation with him. He did not make me any offer to settle the amount of loss, and I did not make him any offer. He just came in, and I said, 'I turned it over to Mr. Bailey,' and he said, 'That's the man I want to see.' I carried him to see Mr. Bailey. I do not know what occurred then. After I found out from Mr. Roberts (adjuster) that he and

I could not agree on the amount of loss, I then employed Mr. Bailey to represent me. Then he and Mr. Roberts took the matter up between them."

The record does not disclose what occurred between the attorney and the adjuster.

On the second trip the adjuster made a demand upon the insured for an appraisal of the loss in accordance with the policy. Thereupon the parties, on February 16, 1926, mutually entered into the stipulation for appraisal in accordance with the terms of the policy, the insured naming J. F. Kunkel, and the insurance company naming A. L. Hartshorn, respectively, as appraisers. The insured entered into the appraisal agreement, "claiming that the loss was a total one, and insisting that the appraisers determine whether or not the loss is a total one, first."

It is believed the evidence shows actual disagreement between the adjuster and the insured as to the amount of loss, sufficient to make operative the provision in the policy for arbitration of the differences. The adjuster actually made an estimate of the loss and was in a position, before the meeting, to know and have an opinion of the amount of the loss. He refused to take the estimate of the insured after scrutinizing it, because, in his judgment, it was "too high." He refused the second offer, because, in his judgment, it exceeded the actual amount of loss. The objections of the adjuster were general in a sense, but nevertheless directly bearing "upon the amount of loss." The property destroyed by the fire was a building, and not a mass of personal property, every item of which would have to be considered in arriving at amount of loss. And in this respect the present case differs from Hickerson v. Ins. Co., 96 Tenn. 193, 33 S. W. 1041,[1] cited in Joyce on Insurance, § 3237. There was a wide difference of opinion of the amount of loss between the adjuster's estimate and the insured's estimate. The adjuster's estimate was $950, and the insured's estimate was $2,334.27. The respective estimates were made in good faith and evidence an effort on the part of each party to arrive at the actual loss, and there was no mere arbitrary refusal or neglect on the part of the adjuster to arrive at the actual loss or to accept or agree upon the insured's estimate. There was no room for the adjuster, from his standpoint of the loss, to offer a higher amount than $950, and there was no room for the insured to accept that sum without doing so merely as a matter of compromise. And it is obvious that both parties saw and understood that there was a real difference of opinion and disagreement as to the amount of actual loss, entirely separating them from an agreement. In that view and because thereof, the parties mutually agreed to arbitrate. A jury could not fairly have inferred otherwise than that there was a real difference in good faith between

[1] 32 L. R. A. 172.

the parties. The facts are different from the cases of Ins. Co. v. Simmons, 12 Tex. Civ. App. 607, 35 S. W. 723, and Ins. Co. v. Barnett (Tex. Civ. App.) 213 S. W. 365.

[4] The next question, then, is, Did the arbitration fail and come to an end through the perverse or inexcusable conduct of the appellant's appraiser? If so, the appellee was entitled to sue on the policy without compliance with a further demand for new arbitration, or without resuming the pending arbitration; otherwise, the arbitration clause would stand in the way of this suit. It appears that the appraiser selected by the insured was, and the appraiser selected by the insurance company was not, a resident of the vicinity of the fire. The two appraisers, after their appointment, had a timely meeting. At the beginning of the meeting the two appraisers attempted to select an umpire. As shown, the appraiser of the company requested the appraiser of the insured "to select a man." The appraiser of the insured then submitted successively the names of six persons who lived in the locality of the fire. The first two names were objected to by the appraiser of the company on the ground that they were bankers, and not "a carpenter or contractor." The next three persons, of commercial occupation, were objected to for the same reason. The sixth person, who was a contractor, was objected to because he had previously made an itemized estimate of the loss under employment of the insured. All the persons named were shown to be upright men and of high repute in the community. The appraiser for the insured testified, briefly stated:

"He (the company appraiser) asked me whom I had selected, and I said I didn't have any one. Then he asked me to select a man. I suggested the names of some. * * * He refused to accept any one of these. The only reason he assigned was that he (the umpire) must be a carpenter or contractor. He did not suggest the name of any one to serve, and I don't think I requested him to do so. Mr. Hartshorn (the company appraiser) and I were together at this time for only a very few minutes. * * * I believe he suggested that we get some one away from here and asked me if I would do that. I said I would not select any one that I did not know. I don't remember whether or not Mr. Hartshorn stated that he would not agree to any one other than some one outside of Red River county. I know that he said he would not take any one except a contractor, architect, or carpenter, and I believe he said some one that he knew. I would not be absolutely certain about that, however. When I selected the last man—Mr. Hayes—he said, 'You select another carpenter,' and I said, 'If you won't take men like that, there is no use of my suggesting any one else,' and I did not suggest any more. * * * I said if he would not take men like I suggested we would call it a hung jury. That was the language I used."

The appraiser of the company thus describes the meeting, briefly stated:

"No appraisement of the loss was made by me and Mr. Kunkel because we were unable to agree on an umpire. The meeting lasted about 10 minutes. I would not accept either of the men offered by Mr. Kunkel. He stated to me that I could accept one of the men offered by him or none; that if I refused to accept one of these men the result would be a hung jury. * * * I objected to these parties for the reason that we should select an umpire who was competent and disinterested. I did not submit the name or names of any party or parties to act as umpire. I had names to submit, but Mr. Kunkel advised me that he would not accept any other than those offered by him. I did nothing in the matter toward the selection of an umpire other than to reject all the parties submitted by Mr. Kunkel. I did not insist that the umpire be a man that I knew, but did insist that he should be competent and disinterested to pass upon the loss."

It further appears that after the meeting above referred to the appraiser of the company timely wrote the appraiser of the insured two letters, on different dates, offering to proceed and "to co-operate with you" in selecting an umpire. The appraiser of the insured did not reply to the first letter, but on April 23, 1926, did reply to the last one, saying:

"I am just like I was when you were here, ready and willing to proceed."

The appraiser of the company promptly replied to the letter on April 27, 1926, saying:

"When you are ready to agree upon a competent and disinterested umpire to act with us in the matter I will be glad to co-operate with you and dispose of the matter, but I assure you I have no idea of going into this appraisal with any other kind of an umpire if I know it."

On April 29, 1926, the insured filed the present suit, and the appraisers never met together.

The above is a short statement of what is apparent from the record of what happened in the meeting of the two appraisers, lasting only "about 10 minutes." And we are unwilling to hold that the evidence warranted the jury in finding that the failure to select an umpire was due "solely" to "the neglect or fault" of the appraiser of the company. There was no showing that the company appraiser was actuated in the meeting by any other reason than to endeavor to select a competent and disinterested "contractor, architect, or carpenter" as umpire, rather than the specified persons of other occupations. It is not perceived that such instance would evince a purpose on the part of the company appraiser to derive an undue and unfair advantage in the arbitration, or a mere inexcusable or arbitrary refusal to accept names submitted. There is little doubt that "10 minutes" discussion of the proper qualifications of an umpire without agreement is not of itself sufficient ground to base bad faith or perversity upon. The appraiser of the in-

sured could be said to have been as much at fault, if not more, as the appraiser of the company. The company appraiser may not be regarded, in the circumstances, as merely arbitrarily. putting an end to the effort to agree on an umpire, or as seeking an improper advantage.

[5] The appellee seems to urge that the failure to agree upon an umpire should be, held conclusive of the right to maintain this suit, because by extraneous evidence it was shown that the appraiser for the company was not an impartial and nonpartisan person, suitable for selection in the first instance, in that he had been selected by the company as its appraiser many times before and in the cases had consistently served with partiality and bias in making awards of amount of damage. Even if true, this fact alone would not necessarily or probably be inconsistent with his impartiality in the present case, in the absence of some act or conduct tending to exhibit his serving the company's interest as a partisan would. His actions in the meeting of the two appraisers do not suggest inconsistency with impartiality and disinterestedness. And the present suit is not a suit on the appraisers' award, claiming it to be invalid for undue partiality of one appraiser, as in the cases cited of Ins. Co. v. Development Co. (Tex. Civ. App.) 275 S. W. 203, and others. In the case of Ins. Co. v. Mumaw (Tex. Civ. App.) 287 S. W. 120, the actual award made in favor of the plaintiff was pleaded in bar of the suit and held ineffectual because of undue partiality of the company appraiser. In such cases the award may be legally set aside for undue partiality because it is in the nature of fraud or unfair dealing, rendering the award so made void.

The judgment is reversed, and the cause is remanded.